**William STEGALL, on Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**Charles L. LADNER, James F. Carlin, William H. Cunningham, Ronald R. Dion, Steven Pruchansky, Norman H. Smith, John P. Toolan, James A. Shepherdson, Dennis S. Arnowitz, Richard P. Chapman, Jr., William J. Cosgrove,**

---

Richard A. Farrell, William F. Glavin, John A. Moore, Patti Mcgill Peterson, John W. Pratt, John Hancock Advisers, LLC, Independence Investment, LLC, Nicholas–Applegate Capital Management, Pzena Management, LLC, Shaw Assets Management, Inc., Sustainable Growth Advisers, LP, American Fund Advisors, Inc. Defendants.

No. CIV.A. 05–10062–DPW.

United States District Court,
D. Massachusetts.

Oct. 14, 2005.

Hank Bates, Little Rock, AR, David Pastor, Gilman and Pastor, LLP, Boston, MA, Randall K. Pulliam, Baron & Budd, P.C., Dallas, TX, for Plaintiff.

Jason N. Golub, Foley & Lardner, LLP, Washington, DC, Ashley K. Handwerk, Kirkpatrick & Lockhart, Nicholson Graham LLP, William Shaw McDermott, Kirkpatrick & Lockhart, Steven P. Wright, Kirkpatrick & Lockhart Nicholson Graham, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff William Stegall seeks recovery for himself and others similarly situated from certain directors, investment advisers, and affiliates of the John Hancock Family of Funds (the "Funds"). Plaintiff contends that defendants improperly failed to participate in securities class actions in which the Funds were putative members. Defendants have moved to dismiss the action. For the reasons provided below, that motion will be granted.

### I. Standard of Review

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). The court, however, need not credit "bald assertions, unsupportable conclusions, or opprobrious epithets." *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir.1987). Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir.1999).

A reviewing court is not entirely constrained by the four corners of the complaint. Consideration may also be given to "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3.

### II. Background

The John Hancock Family of Funds consists of approximately 33 funds and is part of the larger corporate body whose parent is John Hancock Financial Services, Inc., referred to by plaintiff as the Parent Company Defendant. The remaining defendants are directors, advisors, and affiliates of the Funds. (Compl.¶¶ 11–15). As owners of securities, the Funds were putative class members in a number of class action

lawsuits brought against publicly traded companies for alleged violations of securities law. Defendants allegedly did not ensure participation of the Funds in the lawsuits.

Consequently, plaintiff—who "at all relevant times owned one of the Funds," (Compl.¶ 10)—now seeks to recover losses resulting from those failures to participate in class action lawsuits. And, because the Funds share the same corporate parent and conduct themselves according to identical policies, plaintiff seeks to bring this action "on behalf of all the Funds." The losses allegedly stem from settlement monies that, if properly claimed by defendants as fiduciaries for plaintiff and the proposed class, would have increased the overall assets held by the Funds.

Recovery is sought under five counts: (1) breach of fiduciary duty; (2) negligence; (3) violation of section 36(a) of the Investment Company Act ("ICA"), 15 U.S.C. § 80a–35(a); (4) violation of section 36(b) of the ICA, 15 U.S.C. § 80a–35(b); and (5) violation of section 47(b) of the ICA, 15 U.S.C. § 80a–46(b). In response, defendants press a series of arguments in seeking dismissal of the complaint, to which I now turn.

### III. Discussion

Mutual funds are customarily organized by large financial institutions to offer investors the opportunity, through pooling of resources, to enjoy the benefits of professional money managers. Seeking to address the inherent conflicts of interest of fund managers and the abuses that inevitably resulted, Congress enacted the ICA to protect investors who entrusted their money to such investment company funds. See H.R.Rep. No. 76–2639, at 10 (1940)

(statute was "needed to protect small investors from breaches of trust upon the part of unscrupulous managements and to provide such investors with a regulated institution for the investment of their savings"). The statutory scheme addresses a number of distinct concerns arising out of "breaches of trust" by money managers, from provisions regarding the nature of board control to protection against excessive fees. Taken as a whole, the statute serves to establish the best interests of shareholders—and not managers—as the lodestar. Here, plaintiff contends defendants lost sight of this overarching responsibility. Defendants respond with a series of arguments attacking the adequacy of plaintiff's complaint.

### A. Standing

 Defendants argue, as grounds to dismiss plaintiff's entire complaint, that Mr. Stegall lacks standing to seek recovery for the harm alleged. Standing is a threshold question and, as the First Circuit quite recently observed, it "comprises a mix of constitutional and prudential criteria." *Osediacz v. City of Cranston*, 414 F.3d 136, 139 (1st Cir.2005) (citing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), and *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 13 (1st Cir.1996)). Distilled to its essence, standing comprises a three-part analysis requiring a plaintiff to show[1] that (1) he suffered an injury in fact (2) that is fairly traceable to the alleged misconduct and (3) can be redressed by the relief plaintiff seeks from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In addition to these essential

---

1. The party seeking to invoke federal jurisdiction, most commonly, as here, the plaintiff,

"bears the burden of pleading and proof on each step of the standing pavane." *Osediacz*

elements and in keeping with these important concepts,

> the Supreme Court has embellished the constitutional requirements attendant to standing with an array of prudential monitions. The prudential aspects of standing include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."

*Osediacz,* 414 F.3d at 139 (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

█ In his complaint, Mr. Stegall simply alleged that he "at all relevant times owned one of the Funds." (Compl.¶ 10) In his narrative response to defendants' motion, plaintiff specifies that he owns shares in the John Hancock Small Cap Fund, which is in a series of funds issued by John Hancock Investment Trust II (the "Trust").[2] (Pl.'s Mem. Opp. at 5.) Defendant contends that this provides an insufficient showing of standing, in so far as plaintiff has failed to "(1) identify a single injury to his fund or any of the funds within the Trust, (2) identify a single class action settlement that any of the funds within the Trust were eligible for and (3) to identify any injury caused by any of the Defendants with respect to the management of the funds in the Trust." (Def.'s Reply at 3)

As an initial matter, plaintiff argues in his opposition that as an owner of a fund with the investment company, the Trust, he "has individual standing to pursue claims involving all of the funds within the [Trust]." (Pl.'s Mem. Opp. at 5.) I take this as a concession that he does not claim to have standing to seek recovery for injuries suffered by funds outside of the Trust. In any event, I find that he has no standing to pursue claims for other funds within the Trust, but rather only for those he himself owns.

Plaintiff distinguishes investment companies, such as the Trust, from individual unincorporated funds, such as the Small Cap Fund, arguing that the latter is a mere shell. For that reason, plaintiff argues that injuries to his fund confer standing to seek recovery for injuries suffered by all funds overseen by the Trust. Plaintiff's characterization of mutual funds, however, does not comport with the case law. In certain contexts, "each fund is a separate corporate entity with separate management contracts and share distribution plans ...." *Wicks v. Putnam Investment Mgmt., LLC,* 2005 WL 705360, at *3 (D.Mass. Mar. 28, 2005). When that is the case, one clearly may not use the corporate structure of the broader investment company to confer standing across all funds within that company. *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. 38, 41 (D.Mass.2003).

That conclusion is not altered where, as here, each fund is not separately incorporated. In *Williams v. Bank One Corp.,* 2003 WL 22964376 (N.D.Ill. Dec. 15, 2003), the court found that the plaintiff could not bring a derivative shareholder suit on be-

---

*v. City of Cranston,* 414 F.3d 136, 139 (1st Cir.2005).

**2.** Although this information is not in the relevant pleadings, I will, for purposes of the discussion here, analyze the standing issue assuming the truth of the proffer regarding fund ownership. Plaintiff has not, however, named either the Small Cap Fund or the Trust as a defendant in this action. Nevertheless, counsel for defendants agreed at the July 26, 2005, hearing that those parties would be bound by my determination of the motion to dismiss.

half of other unincorporated funds within a larger incorporated business trust:

> There is no precise parallel to the described arrangement in the corporate world, but the closest analogy still seems to be that of separate subsidiaries (the various mutual funds) that share a common parent (the Massachusetts business trust). What controls over the other factors identified in counsel's submission is the total separateness of the beneficial interest in the funds, with Williams being a shareholder in only two of them. Williams' small holdings in those two funds provide no justification for using them as a springboard for him to act on behalf of the umbrella Massachusetts trust—indeed, any allegation of Williams' ownership interest in *that* entity is conspicuously absent from the Derivative Complaint. And as for the other One Group Funds, any notion of Williams being able to bootstrap upstream to the business trust and thence downstream to the other separate funds clearly has nothing at all to commend it.

*Id.* at *1. Plaintiff has offered nothing more persuasive here to commend the concept of his sharing an injury suffered by funds in which he had no ownership interest. His beneficial interest extends only to the investment decisions of the Small Cap Fund and does not permit him to bootstrap claims arising out of investment decisions made in relation to other funds in which he was not a participant.

Accordingly, plaintiff would have standing to seek recovery for injuries to the Small Cap Fund.[3] All other defendants would have to be dismissed from the action. As the court explained in *Eaton*

*Vance,* 219 F.R.D. at 41, where the funds apparently were individually incorporated,

> [t]he named plaintiffs in this case are seeking to sue four mutual funds, each of which is a separate defendant. Yet the named plaintiffs never purchased shares in or conducted any other business with two of the four funds, namely, the Institutional and Advisers funds. The named plaintiffs have therefore not been injured by Institutional and Advisers funds. Because the plaintiffs cannot "demonstrate the requisite case or controversy between themselves personally and [the Institutional and Advisers funds], 'none may seek relief on behalf of himself or any other member of the class.'" The named plaintiffs' claim against the Institutional and Advisers funds are therefore dismissed; the named plaintiffs are also precluded from representing investors who purchased shares in those two funds.

*Id.* at 41 (citations omitted). So too here.

In any event, plaintiff's claims—whether against the Trust or the Small Cap Fund—fail on other grounds. *Cf. Jacobs v. Bremner,* 378 F.Supp.2d 861, 862–63 (N.D.Ill.2005) ("[I]t is undisputed that [plaintiff] invested in, and therefore does have standing to sue on behalf of all investors in, the Nuveen Large–Cap Value Fund, and that means this Court can consider the merits of [plaintiff's] claims at least as to that fund. And because analysis leads to the conclusion that [plaintiff's] federal claims must be dismissed, the question of standing as to the other funds is rendered moot.") (citation and footnote omitted).

---

**3.** Defendants contend that plaintiff has failed to adequately demonstrate that the Small Cap Fund was injured by a failure to participate in a class action settlement. I assume that plaintiff's proffered argument and statement of ownership in that fund is a representation that, given leave to amend, he would be able to plead such a fact. In any event, because the complaint fails in other, incurable, ways, the issue is immaterial to resolution of the motion.

## B. Derivative v. Direct

■ Defendants contend that plaintiff's § 36(a) claim was brought improperly as a direct action. To resolve that question, I must look to the law of the Funds' state of corporation, *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97–99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), here, Massachusetts. In Massachusetts, "[t]o determine whether a claim belongs to the corporation, a court must inquire whether the shareholder's injury is distinct from the injury suffered generally by the shareholders as owners of corporate stock." *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D.Ill., 1999) (citing *Jackson v. Stuhlfire*, 28 Mass.App.Ct. 924, 547 N.E.2d 1146 (1990)); *see Miller v. Mitchell Hutchins Asset Mgmt., Inc.*, 2002 U.S. Dist. LEXIS 27675, at *25 (S.D. Ill. March 12, 2002). The alleged injury here is not distinct and, therefore, cannot be brought in its present, direct form.[4]

Plaintiff's allegations relate to a diminution in the total assets of the Funds and only derivatively did this injury harm each shareholder. *See Miller*, 2002 U.S. Dist. LEXIS 27675, at *26 (finding that the complaint "asserts causes of action ... that are for alleged injury to the funds and only derivatively to stockholders such as Plaintiffs"); *Blasberg v. Oxbow Power Corp.*, 934 F.Supp. 21, 26 (D.Mass.1996) ("[I]f a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor."); *see also Farragut Mortg. Co. v. Arthur Andersen LLP*, 1999 WL 823656, 10 Mass. L. Rep. 285 (Mass.Super.1999).

In short, what differentiates a direct from a derivative suit is neither the nature of the damages that result from defendant's alleged conduct, nor the identity of the party who sustained the brunt of the damages, but rather the source of the claim of right itself. If the right flows from the breach of a duty owed by the defendants to the corporation, the harm to the investor flows through the corporation, and a suit brought by the shareholder to redress the harm is one "derivative" of the right retained by the corporation. If the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation, the suit is "direct."

*Branch v. Ernst & Young U.S.*, 1995 WL 791941, at *4 (D.Mass. Dec. 22, 1995).

In arguing that his claims can be brought directly, plaintiff first relies on the Second Circuit's decision in *Strougo v. Bassini*, 282 F.3d 162 (2d Cir.2002). As the court observed in *Green*, when addressing the question of whether plaintiffs' ICA claims were derivative under both Massachusetts and Minnesota law, *Strougo* does not stand for a different proposition.

In *Strougo*, the court discussed numerous cases in which majority or controlling shareholders caused injuries unique to minority shareholders. The court then dismissed the plaintiffs' claims, because, unlike the plaintiffs in the cases which the court had reviewed, the plaintiff in *Strougo* did not allege that he was a "minority shareholder whose owner-

---

4. Defendants have requested that I not exercise jurisdiction over the state claims. I must, however, apply Massachusetts law to the question of whether plaintiff's claims are derivative in nature. Consequently, I inquired of the parties whether they would view my resolution of that question as binding upon them in any future action brought in state court. The parties stipulated that they would.

ship interest was diluted disproportionately to that of majority shareholders." The complaint in the case at bar alleges that all of the common shareholders sustained the same injuries as a result of the compensation scheme. The existence of preferred shares, standing alone, does not render the common shareholders' injuries distinct from the Funds' injuries.

186 F.R.D. at 490 (citations omitted).[5] More recently, in *Hogan v. Baker*, 2005 WL 1949476, 2005 U.S. Dist. LEXIS 16888 (N.D.Tex. Aug. 12, 2005), the court observed that

> [i]n *Strougo* ... the individual shareholders were able to demonstrate an independent injury, and therefore, could bring direct actions. For example, the court in *Strougo* permitted a direct action because "the acts that allegedly harmed the shareholders increased the Funds' assets." Accordingly, the corporation could not pursue relief for the injuries because they were suffered by the shareholders alone. Further, *Strougo* directly undercuts Plaintiffs' argument by reasoning that a "diminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right."

*Id.*, 2005 WL 1949476, at *3, 2005 U.S. Dist. LEXIS 16888, at *9–10 (citations omitted). Nothing about the injury alleged by plaintiff in this case is distinct from that suffered by other shareholders—or the Funds, for that matter.

Plaintiff turns next to the nature of the mutual fund corporate structure in support of the contention that his claims may be brought directly. Observing that mutual funds have been described as "mere shells," *see Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir.1977), plaintiff argues that injury of the type pled flows by its nature directly to shareholders.[6] He relies on *Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529, 2005 U.S. Dist. LEXIS 9625 (N.D.Cal. March 7, 2005), which he describes as rejecting an argument similar to defendants' by "recognizing the unique structure and operation of mutual funds." (Pl.'s Mem. Opp. at 10.) The *Strigliabotti* court did find that "individual investors, who own[ed] the Funds' assets and bear its expenses directly on a pro rata basis" were entitled to bring a direct action. *Id.* 2005 WL 645529, at *8, 2005 U.S. Dist. LEXIS 9625, at *25. To the extent *Strigliabotti* stands for the proposition that mutual fund investors enjoy the right to a direct action simply because the value of shares in the fund are computed daily on a pro rata basis, I find it unpersuasive. That description of mutual funds does not distinguish them in any material way from traditional corporations. *Cf. Hogan*, 2005 WL 1949476, at *4, 2005 U.S. Dist. LEXIS 16888, at *12 (rejecting the reasoning of *Strigliabotti*, "unpersuaded that the distinction between mutual fund ownership and stock ownership described by Plaintiffs is sufficient to transform their claims from derivative to direct").

Plaintiff offers that

> [t]he value of each investor's portion of those pooled assets is determined by

---

5. Moreover, Maryland law controlled in *Strougo*. Under Maryland law, a party may bring a suit directly so long as the alleged injury is distinct from that of the corporation and need not show, as they must in Massachusetts, that the alleged injury is distinct "from that of other shareholders." *Strougo*, 282 F.3d at 171.

6. Even if I were to find that a mutual fund were a shell, that does not end the inquiry. More traditional corporate entities are legal creations of often shell-like quality themselves.

taking the market value of all of the fund's portfolio securities, adding the value of any other fund assets, subtracting fund liabilities (primarily fees paid to Defendants), and dividing the result by the number of shares outstanding. This so-called "per share net asset value" (NAV) is computed daily so that any gain or loss in fund assets is immediately allocated to the individual investors as of that specific date. Accordingly, mutual funds are unlike conventional corporations in that any increase or decrease in fund assets is immediately passed on or allocated to the fund investors as of the date of the relevant recalculation of the NAV.

(Pl.'s Mem. Opp. at 10.) When plaintiff refers to increases in assets being "passed on or allocated" he means in terms of the daily *pro forma* calculations and not actual distributions. I do not see how that calculation is materially different from fluctuating daily prices of shares held by stockholders of publicly traded corporations. The assets remain those of the fund, as the earnings are of a corporation until distributed. The mutual fund participant has a right to those assets, but that right derives from—is derivative of—the fund.

In *Green,* the court addressed the question of whether plaintiffs' ICA claims were derivative under both Massachusetts and Minnesota law. Although plaintiffs' complaint there, like Mr. Stegall's here, did not allege a distinct injury, they "argue[d] that nonetheless[] their injury [was] unique." 186 F.R.D. at 489. The court rejected an argument that relied on *Strougo,* as well as plaintiffs' argument regarding diminution in share values, an injury suffered by the funds. *See id.* at 490. The court found equally unavailing plaintiffs more generalized arguments based on decisions of "other courts" that had "allowed direct actions for claims brought under the ICA." *Id.* at 489. Most

recently, the court in *Mutchka,* in rejecting the identical argument presented in this case, found the claims to be derivative:

Quite simply, the funds owned the securities and the funds were able to participate in class-action settlements. The fact that Defendants allegedly failed to ensure participation injured the funds. The [plaintiffs'] injury is identical to every other investor's in that their pro rata share of the fund allegedly would have been more valuable had Defendants participated in the settlement.

*Mutchka v. Harris,* 373 F.Supp.2d 1021, 1027–28 (C.D.Cal.2005). Here, as in a recent case in the Southern District of New York interpreting Massachusetts law of derivative actions in the context of mutual funds, "[t]he plaintiffs are damaged indirectly because the assets of the Funds are reduced." *In re Eaton Vance Mutual Funds Fee Litig.,* 380 F.Supp.2d 222, 234 (S.D.N.Y.2005).

■ In short, the pooling of resources, collective assets, expenses, and management to a great extent restrict the duties owed to individual investors. That defendants do not owe a duty directly to plaintiff in this setting is not the same as saying that no duties to individual investors are owed. In the context of the mutual fund, at least so far as decisions affecting all shareholders in the same way are concerned, managers owe a duty to the fund itself. Plaintiff enjoys the benefits of that duty, but does so derivatively. Consequently, he is empowered to enforce that duty, but must do so on behalf of the fund after providing the fund an opportunity to take action on its own behalf. In sum, "a complaint alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation" and "is properly derivative." *Jackson,* 28 Mass.App.Ct. at

925, 547 N.E.2d 1146. Consistent with that finding, the demand requirements imposed on derivative actions by the Commonwealth of Massachusetts are also implicated. *Cf. Kamen,* 500 U.S. at 96–97, 111 S.Ct. 1711 (demand futility question is one of " 'substance,' not 'procedure' " and so is generally defined by state law so long as it is not inconsistent with the policies undergirding the federal statute). This action was brought after July 1, 2004, the date when a "universal demand" requirement—preventing a demand futility defense—came into effect in Massachusetts. Mass. Gen. Laws ch. 156D, § 7.42 (effective July 1, 2004) ("demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand."); *ING Principal Protection Funds Derivative Litig.,* 369 F.Supp.2d 163, 170 (D.Mass.2005). I see no reason, based on the treatment of mutual funds, to find that the universal demand requirement does not apply to mutual funds. *See ING Principal Protection Funds,* 369 F.Supp.2d at 171 ("Plaintiffs ... argue that the newly enacted universal demand requirement only applies to derivative suits brought on behalf of corporations. But a business trust 'in practical effect is in many respects similar to a corporation.' This court believes that Massachusetts courts will apply the requirement of universal, pre-suit demand to derivative actions brought on behalf of business trusts.") (footnote omitted).

Plaintiff brought the actions directly and made no demand on defendants. For that reason, all counts other than that under § 36(b) must be dismissed.

## C. Section 36(a)

■ In addition to their standing and derivative action arguments, defendants contend that § 36(a) of the ICA provides no private right of action, thereby barring plaintiff from pressing the third count of his complaint. Section 36(a) of the ICA provides:

The Commission is authorized to bring an action ... alleging that a person serving or acting in one or more of the following capacities has engaged ... in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts—

(1) as officer, director, member of any advisory board, investment adviser, or depositor; or

(2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

15 U.S.C. § 80a–35(a).[7]

Plaintiff, although conceding that § 36(a) provides no express private right of action, offers that "over the course of the last four decades, courts in nearly every circuit have implied such [private rights of action] under section 36(a) of the ICA." (*See* Pl.'s Opp. at 14) The examples provided, however, reach only so close in time as 1998, three years prior to the Supreme Court's decision in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

The Supreme Court took the opportunity in *Sandoval* to clarify the appropriate approach to implied causes of action. It

---

**7.** Although the relevant provision is 15 U.S.C. § 80a–35, it is commonly referred to as § 36. Similarly, 15 U.S.C. § 80a–46(b) will be discussed as § 47(b). *See infra; Jacobs v. Bremner,* 378 F.Supp.2d 861, 862 n. 1 (N.D.Ill.

2005) ("As do virtually all other opinions involving the [ICA], this opinion will refer to its relevant provisions by their original internal section numbers ... rather than their codified numbers in Title 15.")

referenced "the understanding of private causes of action that held sway 40 years ago" and was "captured by the Court's statement in *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), that 'it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose' expressed by a statute." *Sandoval,* 532 U.S. at 287, 121 S.Ct. 1511. That understanding was disavowed in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), where the Court instructed courts to apply a four factor test to the question of whether a statutory scheme provided for an implied right of action: (1) "is the plaintiff one of the class for whose especial benefit the statute was enacted?"; (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"; (3) "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"; and (4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort,* 422 U.S. at 78, 95 S.Ct. 2080.

*Sandoval* further refined the analysis, requiring courts to focus more closely on whether the statutory intent to "create not just a private right but also a private remedy." *Sandoval,* 532 U.S. at 286, 121 S.Ct. 1511. In the absence of such determinative statutory intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* The search for such intent begins, and often may end, "with the text and structure" of the statutory provision. *Id.* at 288, 121 S.Ct. 1511.

Consequently, although the pre-*Sandoval* cases cited by plaintiff are interesting, they do not stand on as firm an analytical footing as do the cases that have taken up the question of an implied right of action under § 36(a) in the years since *Sandoval.* *DH2, Inc. v. Athanassiades,* 359 F.Supp.2d 708, 715 (N.D.Ill.2005) ("[G]iven [*Sandoval* ], the Court is not persuaded by other non-binding cases cited by Plaintiff to support a private right of action."). And as Judge Selna observed in *Mutchka*—where a private right of action was not recognized under § 36(a)—"cases decided after *Sandoval* have refused to find an implied right of action in the ICA." *Mutchka,* 373 F.Supp.2d at 1026 (citing *Olmsted v. Pruco Life Ins. Co. of N.J.,* 283 F.3d 429, 432 (2d Cir.2002)); *see Dull v. David C. Arch,* 2005 WL 1799270, 2005 U.S. Dist. LEXIS 14988 (N.D.Ill. July 27, 2005) (taking up the same claims as are before me and were before Judge Selna and refusing to recognize a private right of action under § 36(a)). *Cf. Eaton Vance,* 380 F.Supp.2d at 233 ("Following the *Olmsted* decision, the parties have pointed to no opinion in [the Second] Circuit that has considered *Olmsted* and found that Congress intended to create a private right of action under §§ 34(b), 36(a), or 48(a)."). Although the question presented to the court in *Olmsted* is not foursquare with the question before me, the Second Circuit's decision in *Olmsted* offers useful guidance.[8]

---

**8.** *Cf. Chamberlain v. Aberdeen Asset Mgmt. Ltd.,* 2005 WL 195520, at *4 (E.D.N.Y. Jan. 21, 2005) (finding no private cause of action under § 36(a) and observing that although "a reading of *Olmsted* that gives rise to a finding that there is no private right of action under ICA § 36(a) may imply discordance between the *Olmsted* opinion and the *Strougo* opinion issued by the same court only a week earlier, the fact remains that the *Olmsted* opinion is the Second Circuit's more recent ruling on the issue" and "the opinion lists the District Court's opinion in *Strougo* as one of the cases representing the *ancien regime* "), *vacated by*

The Second Circuit relied on three factors in deciding that no implied right of action exists under §§ 26(f) and 27(i) of the ICA. *Cf. DH2,* 359 F.Supp.2d at 714 (noting that the *"Olmsted* reasoning applies with equal force to Section 17(j) of the ICA" in finding no private right of action under that section of the statute). The first was that those subsections lack rights-creating language, "only describ[ing] actions by insurance companies that are prohibited" and "not mention[ing] investors such as the plaintiffs." *Olmsted,* 283 F.3d at 432. As the *Olmsted* court pointed out, *Sandoval* reiterated that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511 (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). Section 36(a) likewise focuses on the actions of fund managers, and makes no mention of investors.

The second basis *Olmsted* cited for finding no implied right of action was that " § 42 of the ICA ... explicitly provides for enforcement of all ICA provisions, including §§ 26(f) and 27(i), by the Securities and Exchange Commission through investigations and civil suits for injunctions and penalties." *Olmsted,* 283 F.3d at 433. *Olmsted* quotes *Sandoval,* where the Supreme Court stated:

The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others .... Sometimes the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other as-

pects of the statute ... suggest the contrary.

*Sandoval,* 532 U.S. at 290, 121 S.Ct. 1511 (internal citations omitted) (quoted by *Olmsted,* 283 F.3d at 433). In the context of § 36(a), where Securities and Exchange Commission ["SEC"] enforcement is explicitly included in the text of the subsection, the suggestion is considerably stronger than that in §§ 26(f) and 27(i).

The third element of the *Olmsted* reasoning was reference to § 36(b)'s explicit provision for a private right of action. As *Olmsted* observed, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." *Olmsted,* 283 F.3d at 433. In a footnote, however, the court added:

The plaintiffs argue that drawing this inference from § 36(b) [9] is precluded by our holding in *Fogel v. Chestnutt,* 668 F.2d 100 (2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). However, in *Fogel* we merely assumed that when Congress added § 36(b) to the ICA in 1970 it did not intend to overrule previous decisions recognizing implied rights of action in the statute. *Id.* at 111. The instant case is distinguishable because no court of which we are aware has recognized a private right of action to enforce §§ 26(f) and 27(i). Certainly no court could have done so before 1970 because these sections were not added to the ICA until 1996. *See* National Securities Markets Improvement Act of 1996, Pub.L. No. 104–290, §§ 205(a), (b), 110

2005 WL 1378757 (E.D.N.Y. April 6, 2005) (vacating "to permit settlement to proceed .... but not[ing] that this does not constitute a reconsideration of the merits of the case or

a negation of the substance of the previously issued order").

**9.** Section 80a–35(b) of the ICA is commonly referred to, as it is herein, as § 36(b).

Stat. 3416, 3429. We express no opinion on the current validity of our assumption in *Fogel* because in this case we interpret sections added after Congress created the private right of action in § 36(b).

*Olmsted,* 283 F.3d at 433 n. 3.

I am required, by contrast, to interpret a statutory section predating congressional creation of § 36(b)'s private right of action, which, one could argue, could permit drawing a different conclusion regarding § 36(a) than regarding later-added sections of the ICA.[10]

A foundation upon which the implied right of action rested prior to *Sandoval* was the legislative history surrounding the addition of subsection (b) to § 36. In *Young v. Nationwide Life Ins.,* 2 F.Supp.2d 914 (S.D.Tex.1998), the court noted that "when § 36 was amended in 1969 and an express private remedy was added to subsection (b), the legislative history indicates that 'the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a).'" *Id.* at 925 (quoting S.Rep. No. 910184, at 16 (1969)). As *Young* points out, "[c]ourts have interpreted this to mean that Congress did not

intend to eliminate the judicially implied private remedy under subsection (a)." *Id.* at 925; *see Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.,* 825 F.2d 731, 735 (3d Cir.1987) ("Inclusion of such an express private remedy has nothing to do with other sections of the Act . . . and in no way suggests a congressional intent to abolish established implied causes of action."); *Fogel v. Chestnutt,* 668 F.2d 100, 111 (2d Cir.1981) (Friendly, J.) ("[W]e do not think § 36(b) was intended to negate implied causes of action which the courts have found under sections of the Act other than § 36.");[11] *McLachlan v. Simon,* 31 F.Supp.2d 731, 737 (N.D.Cal. 1998); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 378, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the [amending] legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping.")

Although it can be argued that *Sandoval* simply clarifies the *Cort* approach in place

---

10. Consequently, I do not wholly adopt *Mutchka's* observation that the "fact that *Olmsted* dealt with different sections of the ICA does not detract from the applicability of its statutory analysis here." *Mutchka,* 373 F.Supp.2d at 1027 n. 11. It does in this regard—simply not in a way warranting a contrary conclusion. With that said and despite the chronology of enactment, the fact that a private right was provided within the same section as § 36(a) and that, unlike the sections analyzed in *Olmsted,* § 36(a) explicitly provides who shall enforce its protections as opposed to generalized, "it shall be unlawful" sections of the ICA, more strongly points away from implying a right here.

11. Plaintiff cites *Fogel* as finding an implied right of action under § 36(a). Although

Judge Friendly is quite clear that the addition of § 36(b) did not abolish previously recognized implied rights under the ICA, he qualified that finding with the language "other than § 36." *Fogel,* 668 F.2d at 111. He goes on to observe that "Section 36 of the 1940 Act had proved to be an ineffective vehicle for dealing with this problem since it expressly authorized action only by the SEC and imposed a very high standard of proof, to wit, 'gross misconduct or gross abuse of trust.'" *Id.* In short, *Fogel* held that a private right of action can be implied under §§ 10(a) and 15(c) of the ICA and, in so finding, made the observations above regarding § 36 which call into question whether the court would have recognized a private right under § 36(a).

when *Bancroft* and *Fogel* were decided, it has done so in a way that calls into serious question reliance on the "broader context" of statutes where, as here, the "language itself" and "the specific context in which that language is used," *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), invites no clarification:

> Nor do we agree ... that our cases interpreting statutes enacted prior to *Cort v. Ash* have given "dispositive weight" to the "expectations" that the enacting Congress had formed "in light of the 'contemporary legal context.'" ... We have never accorded dispositive weight to context shorn of text. In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text.

*Sandoval,* 532 U.S. at 288, 121 S.Ct. 1511 (citations omitted).

In the end, despite courts having found an implied right of action under § 36(a) prior to *Sandoval,* the Supreme Court decision simply cannot be sidestepped by the plaintiff here. As the court in *Jacobs* observed, in addressing claims identical to those before me, "*Sandoval* ... establishes that the text of the statute—and not

any 'contemporary legal context'—must be the touchstone of any private right of action." 378 F.Supp.2d at 865. Likewise, in *Eaton Vance,* the court recently applied *Sandoval* to claims under the ICA, observing that

> [t]he absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates the strong presumption that Congress did not intend to create private rights of action under §§ 34(b), 36(a), or 48(a).

380 F.Supp.2d at 232.[12]

The statute, as written, provides that the SEC can enforce § 36(a) and that both the SEC and private investors can enforce § 36(b).[13] Only by ignoring the dictates of *Sandoval* and relying on prior precedent implying a right of action under *Cort* could I find a private right of action here. *See Dull,* 2005 WL 1799270, at *3, 2005 U.S. Dist. LEXIS 14988, at *8 (interpreting § 36(a) and concluding that "[b]ecause the statute is unambiguous, the Court need not look to the legislative history"). But, to do so would be, in my estimation, clearly at odds with the guidance provided by the Supreme Court in this realm.[14] *Cf. Exxon*

---

**12.** The court went on to add that the Second Circuit decision in *Strougo v. Bassini,* 282 F.3d 162 (2d Cir.2002) did not require a different result, because it "was issued shortly before ... *Olmsted* and, while it finds that the plaintiffs could pursue claims under §§ 36(a), 36(b), and 48, it appears to assume without discussion that such private rights of action exist under §§ 36(a) and 48." *Eaton Vance,* 380 F.Supp.2d at 232.

**13.** *Dull,* 2005 WL 1799270, at *2, 2005 U.S. Dist. LEXIS 14988, at *7 (citations to *Mutchka* and *Olmsted* omitted):

> The plain language of Section 36(a) unambiguously states that the Commission can bring an action under it. It does not provide for a private right of action.

In contrast to Section 36(a), Section 36(b) of the ICA explicitly provides for a private right of action.

> "Obviously ... when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."

**14.** As an alternative argument, defendants contend that plaintiff has inadequately alleged violations of § 36(a). Defendants argue that § 36(a)'s reference to "personal misconduct" relates only to self-dealing, citing *In re Nuveen Fund Litig.,* 1996 WL 328006, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) and *Prescott v. Allstate Life Ins. Co.,* 341 F.Supp.2d 1023 (N.D.Ill.2004). (Defs.' Mem. at 14.); *see Jacobs,* 378 F.Supp.2d at 867 ("At the end of the day, Jacobs' attempt to broaden

*Mobil Corp. v. Allapattah Servs., Inc.,* —— U.S. ——, ——, 125 S.Ct. 2611, 2625, 162 L.Ed.2d 502 (2005) (where the Court noted that "proponents of the alternative view" of the relevant statute pressed "that the statute is at least ambiguous and that [the Court] should look to other interpretive tools, including the legislative history," but "reject[ed] this argument at the very outset simply because [the statute] is not ambiguous").[15]

### D. Section 36(b)

■ In his complaint, plaintiff alleges that

the reach of Section 36(a) to include general nonfeasance of a fiduciary duty is unavailing. Congress plainly did not create Section 36(a) as a catchall for any fiduciary breach. For that reason the prevailing caselaw has read 'personal misconduct' to require some showing of self-dealing. Jacobs has advanced no such allegations, instead setting out a garden-variety fiduciary claim, which remains the domain of state law.").

Because the claim fails on other grounds, I do not reach the merits of that argument. *Cf. Young,* 2 F.Supp.2d at 927 (refusing to interpret § 36(a) to cover only allegations of self-dealing).

15. Justice Kennedy observed that

As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in " 'looking over a crowd and picking out your friends.' " Second, judicial reliance on legislative ma-

[t]he Advisor Defendants, the Parent Company, and other affiliates, upon information and belief, breached their fiduciary duty arising under Section 36(b) of the ICA by failing to submit Proof of Claim forms or otherwise participate in settled securities class actions and thereby recover money rightfully belonging to the Fund investors and which would have been immediately allocated to the individual investors through the recalculation of the NAV.

(Compl.¶ 43) Pursuant to § 36(b) of the ICA, "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the

terials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. We need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable in all circumstances, a point on which Members of this Court have disagreed. It is clear, however, that in this instance both criticisms are right on the mark.

*Exxon Mobil,* 125 S.Ct. at 2626 (citation omitted); *see Jacobs,* 378 F.Supp.2d at 866 ("After Exxon Mobil, there is simply no room to imply a private right of action under Section 36(a). Even were *Central Bank* and *Sandoval* to be discounted on the basis that they were concerned primarily with interpreting congressional silence, *Exxon Mobil* forecloses any possibility of using Section 36(a)'s clear legislative history to create a private right of action where the unambiguous statutory language creates none. Because the plain statutory text of Section 36(a) provides a right of action only for the SEC, the inquiry as to whether a private right of action exists ends there and must be answered in the negative. And because that answer leaves Jacobs without standing to bring suit under Section 36(a), his claim under that provision must be and is dismissed.").

receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser ...." 15 U.S.C. § 80a–35(b). Claims may be brought under this section not only by the investment company but also "by a security holder of such registered investment company on behalf of such company ...." *Id.* There being no dispute that § 36(b) provides for a private right of action and assuming plaintiff may bring this claim directly,[16] I take up defendants' argument that plaintiff's complaint does not plead a violation of § 36(b).

In *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir.1982), the Second Circuit defined an excessive fee for purposes of § 36(b) as one that is "so disproportionally large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 928. As Judge Saris observed in *Krantz v. Fidelity Mgmt. & Research, Co.*, 98 F.Supp.2d 150 (D.Mass.2000), the First Circuit "has not had occasion to set an excessive fees standard," though "two lower courts outside the Second Circuit have applied the *Gartenberg* standard." *Id.* at 158 (citing *Migdal v. Rowe–Price Fleming*, 1999 WL 104795, 1999 U.S. Dist. LEXIS 22001 (D.Md. Jan. 20, 1999), *aff'd by*, 248 F.3d 321 (4th Cir.2001); and *King v. Douglass*, 973 F.Supp. 707, 722 (S.D.Tex. 1996)). The District of Maryland decision was later affirmed by the Fourth Circuit. *See also Miller v. Mitchell Hutchins Asset Mgmt., Inc.*, 2002 U.S. Dist. LEXIS 27675, at *13–14 (S.D.Ill. March 12, 2002) ("Al-

---

**16.** Despite the statute's use of the language "on behalf of such company," defendants claim that the "only claim that a fund shareholder may assert directly is the claim under Section 36(b) of the ICA." (Def.'s Mem. at 15.) This does not seem to be seriously in dispute. In *Mutchka v. Harris*, 373 F.Supp.2d 1021 (C.D.Cal.2005), upon which defendants rely a great deal in their reply, however, the court does state that section 36(b) claims provide a private *derivative* cause of action. *See id.* at 1025. And, defendants in their reply argue that the *Mutchka* court "[c]oncluded that all of plaintiffs' non-Section 36(b) claims were derivative, not direct." (Defs.' Reply at 2). In any event, courts have found a direct cause of action under § 36(b). *See, e.g., Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529, at *8, 2005 U.S. Dist. LEXIS 9625, at *25 (N.D.Cal. March 7, 2005); *Krantz v. Fidelity Mgmt. & Research, Co.*, 98 F.Supp.2d 150, 157–58 (D.Mass.2000) ("A shareholder has a direct private cause of action under § 36(b) against the investment adviser 'for breach of fiduciary duty in respect of ... compensation' paid by a fund."). As the Supreme Court determined in *Daily Income, Inc. v. Fox*, 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984), a shareholder's § 36(b) "suit on the fund's behalf was not a 'derivative' one in the sense that the shareholder was seeking to enforce a cause of action that the fund had but refused to enforce on its own." *Wicks v. Putnam Investment Mgmt., LLC*, 2005 WL 705360, at *3. (D.Mass. March 28, 2005).

In the final analysis, because plaintiff fails to state a cause of action under § 36(b), it is immaterial whether he may bring the claim directly. *Cf. Jacobs*, 378 F.Supp.2d at 867–68 (citations omitted):

Jacobs has framed his Section 36(b) claim as a direct action against defendants. Because Section 36(b) speaks in terms of an action "by a security holder of such registered investment company on behalf of such company," some courts have read that language as referring to derivative actions—or even as limiting the availability of relief under Section 36(b) to derivative actions alone [citing *Mutchka*].

Such a limited reading might perhaps cut Jacobs' Section 36(b) claim off at the pass. But our Court of Appeals has said that even though the statutory text does not appear to permit direct claims, the determination of what constitutes a claim "should generally draw upon state corporation law." If then Massachusetts law would conceptualize the rights and injuries asserted by Jacobs as direct, Section 36(b)'s language could perhaps accommodate that definition so long as doing so would still be consistent with the [ICA's] general purpose of providing shareholder relief.

though the Seventh Circuit has not had occasion to set an excessive fees standard, the Fourth Circuit in *Migdal* and other lower courts have applied the *Gartenberg* standard.").[17]

In *Krantz,* Judge Saris cited the six *Gartenberg* factors to consider when determining whether an advisory fee is excessive:

> 1) the nature and quality of the services provided to fund shareholders; 2) the profitability of the fund to the adviser-manager; 3) economies of scale in operating the fund as it grows larger; 4) comparative fee structures; 5) fallout benefits, i.e., indirect profits to the adviser attributable in some way to the existence of the fund; and 6) the independence and conscientiousness of the directors.

*Krantz,* 98 F.Supp.2d at 158; *see Gartenberg,* 694 F.2d at 929–30. Although a review of the cases below reveals a measure of disagreement among courts about how broadly 36(b) sweeps, *see infra,* the *Gartenberg* factors, whether referred to as such, appear consistently in one form or another in the analyses of other courts. At best, Mr. Stegall's pleadings implicate only one of the six factors, that being the first, relating to the "nature and quality" of the advising services. The relation of plaintiff's allegations to the protections of § 36(b), however, is too attenuated to permit recovery.

"To survive a motion to dismiss, a complaint may not simply allege in a conclusory manner that advisory fees are 'excessive.'" *Migdal v. Rowe Price–Fleming Int'l, Inc.,* 248 F.3d 321, 327 (4th Cir.2001); *Krantz,* 98 F.Supp.2d at 158 ("At the pleading stage, a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss.") (citations omitted). Here, plaintiff fails even to plead explicitly that the fees were excessive. Rather, he simply avers that defendants violated a fiduciary duty by failing to participate in the class action settlements, and, in pleading that under a § 36(b) heading, inferentially presses an excessive fee claim. That is clearly not sufficient.

At a minimum, plaintiff must demonstrate some nexus between the alleged violation of a fiduciary duty and the excessiveness of the fees charged (e.g., lack of arm's length negotiation, refusal to pass along economies of scale, poor overall performance of the fund, comparison to fees charged by comparable fund). *Cf. Migdal,* 248 F.3d at 327 ("Plaintiffs have failed to allege any facts pertinent to this relationship between fees and services."); *Rohrbaugh v. Investment Company Inst.,* 2002 WL 31100821, at *8 (D.D.C. July 2, 2002) ("[T]he case law is unanimous that some connection to a claim for excessive fees is required under section 36(b); that is, a section 36(b) claim must either involve a challenge to excessive advisory fees per se or to conduct that results in excessive advisory fees.").[18]

---

**17.** The *Miller* court added in a footnote that "[b]ecause the Seventh Circuit has not addressed these issues, the Court accords substantial weight to the *Migdal* opinion," *Miller,* 2002 U.S. Dist. LEXIS 27675, at *14 n. 2, citing the Seventh Circuit's instruction that "[a]lthough decisions of other circuits are not necessarily controlling, the district courts should give them substantial weight." *Id.* (citing *Richards v. Local 314, Int'l Bhd. of Elec. Workers,* 790 F.2d 633, 636 (7th Cir. 1986)).

**18.** The *Rohrbaugh* court further noted, in clarifying this point, that, "in fashioning 36(b), Congress was uniquely concerned with providing a remedy in federal court for fee arrangements or contracts that resulted in excessive compensation to investment advisors." 2002 WL 31100821, at *9.

In his complaint, plaintiff described what he believes is a deficiency in the services provided by defendants, but has not explained how any fees charged were excessive in light of those services (in essence, the reverse of the plaintiffs' failure in *Migdal*).[19] To permit the claim to survive in such an instance would turn any breach of a fiduciary duty into a section 36(b) violation. *See Mutchka*, 373 F.Supp.2d at 1025 (finding that if § 36(b) "were interpreted as broadly as the [plaintiffs] posit . . . then a claim always would be tenable under Section 36(b) whenever an investment advisor breached *any* fiduciary duty" (emphasis in original)). But the statute is clear that investment advisers have a "fiduciary duty *with respect to the receipt of compensation* for services," 15 U.S.C. § 80a–35(b) (emphasis added), not that breach of any fiduciary duty is a *per se* violation of section 36(b). *See Rohrbaugh*, 2002 WL 31100821, at *8 (noting that although "section 36(b) provides an express remedy to shareholders for breaches of certain fiduciary duties by investment advisors," it "does not apply to every alleged breach of fiduciary duty by an investment advisor"). As the Fourth Circuit concluded in *Migdal*, and I here find, "[g]eneral breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b)." *Migdal*, 248 F.3d at 329; *see Dull*, 2005 WL 1799270, at *3, 2005 U.S. Dist. LEXIS

14988, at *9–10 (addressing the identical claim made here and finding that plaintiffs failed to state a claim for recovery under § 36(b) because "the allegations plainly do not relate to a 'fiduciary duty with respect to the receipt of compensation for services'"); *see Eaton Vance*, 380 F.Supp.2d at 237 (noting that § 36(b) "addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds").[20] The plaintiffs in *Migdal*—despite allegations that the fees were disproportionate to the services rendered as well as not in alignment with fees charged by comparable funds and that advisers failed to meet their own performance benchmarks—were not permitted by the Fourth Circuit to advance their 36(b) claim. Nor will plaintiff here be permitted to do so.

The *Migdal* approach has been described as "a narrow view of section 36(b)," limiting it "exclusively to challenges to the fees themselves." *Rohrbaugh*, 2002 WL 31100821, at *9 n. 20 (citing *Gartenberg* and *Migdal*). The "broader view" described by Judge Kessler in *Rohrbaugh*, "permit[s] challenges . . . for breaches of fiduciary duty as long as they result in or pertain to excessive fees." *Id.* (citing *Green* and *Galfand*). Under either approach, a claim under 36(b) must connect itself in some reasonably direct way to the excessiveness of fees charged.[21] For pur-

19. In *Migdal,* the plaintiff included information in its complaint about the fee but did not sufficiently plead facts establishing the inadequate nature of the services provided for that fee.

20. In *Eaton Vance,* Judge Koeltl further finds that the § 36(b) claims must be dismissed against certain defendants who had not been recipients of the allegedly excessive fees. *See Eaton Vance,* 380 F.Supp.2d at 238 (citing 15 U.S.C. § 80a–35(b)(3)).

21. *Cf. Miller,* 2002 U.S. Dist. LEXIS 27675, at *15–16:

The Amended Complaint do[es] not address whether the fees charged are disproportionate to the services rendered for a particular fund. The Court finds Plaintiffs' assertions: (1) that the fees are higher than those charged to other funds[;] (2) that the fees increased rapidly in recent years; (3) that the economies of scale are not being passed on to shareholders; and (4) that Defendants were motivated by their own interests in

poses of the instant motion, it is unnecessary to determine how close that connection must be; plaintiff simply alleges that a fiduciary duty was breached and—I will infer for purposes of this discussion—a fee was paid. That is clearly not sufficient under any interpretation of 36(b) found in the case law. *Cf. In re Nuveen Fund Litig.*, 1996 WL 328006, at *15, 1996 U.S. Dist. LEXIS 8071, at *47 (N.D. Ill. June 11, 1996) ("While § 36(b) may regulate more than the mere terms of the fee arrangement between the investment adviser and the investment company, the court does not believe that it regulates the propriety of the transactions for which fees are paid.").[22]

Even those cases described by *Rohrbaugh* as representing "a broader view" of section 36(b), *Rohrbaugh*, 2002 WL 31100821, at *9 n. 20, require an explicit connection between the conduct alleged and the fee charged. In *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682 (3d Cir. 2002), the court left open the possibility

that a plaintiff could recover under 36(b) where a fee arrangement provided investment advisers with "an incentive to maximize leverage *in order to increase their advisory fees.*" *Id.* at 684 (emphasis added). Not only was the conduct there at issue directed at increasing fees, the court described § 36(b) as a "very specific, narrow federal remedy." *Id.* at 685.[23] And, in *Galfand v. Chestnutt*, 545 F.2d 807 (2d Cir.1976), although the court permitted recovery based on the withholding of material information (improper conduct at least facially discrete from a *per se* excessive fee), the court found the withheld information material because it related to "a subject of considerable interest to shareholders who were being asked effectively to increase the fee of their investment adviser." *Id.* at 813.

Finally, quite recently in *Strigliabotti*, 2005 WL 645529, 2005 U.S. Dist. LEXIS 9625, the court permitted a § 36(b) claim to proceed, but there the "complaint allege[d] that defendants charged plaintiffs

> determining the level and propriety of these investment advisory and distribution fees are conclusory and are not sufficient to state [a] claim under § 36(b). Plaintiffs have not made any factual allegations that reflect deficiencies in the services provided or disproportionality between the value of those services and the distribution fees charged.

**22.** *See also Rohrbaugh*, 2002 WL 31100821, at *9 n. 22:

> Plaintiffs attempt to rely on the following dicta in *In re Nuveen Fund Litig.*, 1996 WL 328006, at *5–6, 1996 U.S. Dist. LEXIS 8071, at *15 "36(b) may regulate more than the mere terms of the fee arrangement between the investment adviser and the investment company." In fact, the district court dismissed the complaint for failure to challenge the fee arrangement, explaining: Section 36(b) only imposes a direct fiduciary duty on the investment adviser with 'respect to the receipt of compensation or payment for services.' It requires that

> the investment adviser not charge disproportionate fees for the services it provides, that it actually provides the services for which it obtains fees, ... the Complaint does not challenge the fee arrangement between the Advisor and the Funds...[.]
> *Id.* at 1996 WL 328006, *5–6, 1996 U.S. Dist. LEXIS 8071, *15.
> In *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 491 (N.D.Ill.1999), the court stated that: "the plain language of Section 36(b) does not specify that the breach of fiduciary duty must relate to excessive compensation." *Id.* at 491. However, *Green* involved a claim challenging compensation paid to an investment advisor, and therefore did not rule on the issue of whether 36(b) applies beyond excessive payments.

**23.** The court affirmed dismissal of the § 36(b) claim because plaintiff pled not a single instance where the "advisors improperly failed to deleverage the Funds in order to maximize their fees." *Green*, 286 F.3d at 686.

higher fees than other clients for equivalent advisory services, and offer[ed] an example of the lower fee schedule utilized in a contract with New York State." *Id.* at 2005 WL 645529, \*3, 2005 U.S. Dist. LEXIS 9625, \*12. Moreover, the funds in that case had "grown in size ... while the nature of the services rendered ha[d] not changed, resulting in disproportionally large advisory fees." *Id.* at 2005 WL 645529, \*3, 2005 U.S. Dist. LEXIS 9625, \*12. Here, no such non-conclusory allegations relating to fees can be found in plaintiff's complaint.[24]

There is some sweeping language to be found in isolated cases that at first glance could potentially aid plaintiff's cause.[25] Upon closer inspection, those cases are equally unavailing. In *Krantz v. Prudential Investments Fund Mgmt. LLC,* 77 F.Supp.2d 559 (D.N.J.1999), Judge Hayden adopted the report and recommendation in which Magistrate Judge Hedges "agree[d] that receipt of compensation while breaching a fiduciary duty violates Section 36(b)." *Id.* at 565. To the extent this statement might be taken to mean that a breach of any fiduciary duty is covered by 36(b), the weight of the case law and the statute itself renders such a finding unpersuasive. The holding of *Krantz,* in any event, was not so broad. Magistrate Judge Hedges first found that agreements entered into with interested board members, violative of section 15(c) of the ICA, could trigger the protection of 36(b) if adequately pled. Although a broad reading of § 36(b), this is still more narrow than plaintiff's suggested interpretation, because it related to arm's length negotiation of the contractual arrange-

ment, including the fee structure. The complaint in *Krantz* also alleged that the fees themselves were excessive, but Magistrate Judge Hedges observed that it "simply characterizes all fees as 'excessive,' without pleading any facts that, if true, would demonstrate that the fee is 'so disproportionately large that it bears no reasonable relationship to the services rendered.'" *Id.* (citation omitted). Plaintiff's complaint does even less, leaving it simply to be implied that the fees were excessive and pressing a *per se* rule enjoying no support in the statute's language or its interpretation by courts.

Plaintiff also relies upon intermediate state appellate court decisions from New York and Illinois. In *Royal Carbo Corp. v. Flameguard, Inc.,* 229 A.D.2d 430, 645 N.Y.S.2d 18 (2d Dep't 1996), the court found that appellants, by breaching their duty of fidelity, gave up their right to compensation. *Id.* at 19. Likewise, in *Letsos v. Century 21–New West Realty,* 285 Ill.App.3d 1056, 221 Ill.Dec. 310, 675 N.E.2d 217 (Ill.App.1996), the court—resolving a question of agency law—stated that "[o]ne who breaches fiduciary duties has no entitlement to compensation during a willful or deliberate course of conduct, adverse to the principal's interest." *Id.* at 1069, 221 Ill.Dec. 310, 675 N.E.2d 217. Even assuming that the fiduciary duties described in those distinct factual contexts are comparable to the duty allegedly breached here, section 36(b) of the ICA "was intended to provide a very specific, narrow federal remedy that is more limited than the common law doctrines" relied

---

**24.** There should be no confusion about the nature of my findings here. To find plaintiff's complaint insufficient on this score is not equivalent to applying a heightened pleading requirement. What he describes, drawing all inferences in his favor and even assuming a

relatively broad application of § 36(b), simply does not constitute a violation of § 36(b).

**25.** "[I]n any event, this Court is bound by holdings, not language." *Sandoval,* 532 U.S. at 282, 121 S.Ct. 1511.

upon here by plaintiff. *Green*, 286 F.3d at 685.

Quite recently in *Hogan*, the court rejected a call to expand § 36(b) to the identical breach of duty pled here, rejecting comparisons to *Krantz* and *Royal Carbo*, and "[f]inding *Mutchka* and related case law persuasive." 2005 WL 1949476, at *6, 2005 U.S. Dist. LEXIS 16888, at *18. In so doing, the court concluded that "36(b) is limited to breaches of fiduciary duty involving investment advisory fees and does not extend to *general* breaches of fiduciary duty." *Id.* (emphasis in original). So too here, where the "[plaintiff's] 'real complaint' is that defendants made a poor management decision by failing to participate in dozens of settlement agreements for which some fund was eligible, and he has not alleged any inherent improprieties in the compensation agreement itself", *Jacobs*, 378 F.Supp.2d at 868, and, consequently, has failed to adequately plead a section 36(b) violation. Because the failure arises out of the substance of plaintiff's sole allegation of misconduct, a failure for which I can foresee no cure, leave to amend the complaint to re-plead this count will not be granted.

### E. Section 47(b)

Plaintiff concedes that, "[a]s Defendants recognize, ICA § 47(b) provides a remedy rather than a distinct cause of action or basis of liability." (Pl.'s Mem. Opp. at 19.) Consequently, having insufficiently pled his underlying causes of action, plaintiff's § 47(b) also fails. *See Mutchka*, 373 F.Supp.2d at 1027 ("The parties agree that Section 47(b) is remedial in nature and

26. In light of plaintiff's failure to plead federal causes of action adequately, I will also dismiss his state claims. *Cf. Eaton Vance*, 380 F.Supp.2d 222; *Dull*, 2005 WL 1799270, at *3, 2005 U.S. Dist. LEXIS 14988, at *11. I

does not itself provide a cause of action.").[26]

## IV. Conclusion

For the aforementioned reasons, the motion to dismiss of defendants is hereby GRANTED.

note in this regard that the parties stipulated at the July 26, 2005, hearing on this motion that my determination regarding the derivative nature of plaintiff's claims would bind them in future actions in the state courts.